# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| RAMESH KADIYAM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> UNITED HOMES GROUP, INC., MICHAEL NIERI, JOHN G. MICENKO, JR., and KEITH FELDMAN, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Ramesh Kadiyam ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by United Homes Group, Inc. ("United Homes" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by United Homes; and (c) review of other publicly available information concerning United Homes.

**NATURE OF THE ACTION AND OVERVIEW**

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired United Homes securities between May 19, 2025 and February 22, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      United Homes is a residential home building company. It was founded by Michael Nieri ("Nieri"), who was Chief Executive Officer until October 2024 and has been the Company's Executive Chairman since that time. As of April 22, 2025, Nieri and his family members held 100% of Class B shares, representing 79% of the voting power of the common equity, and held 68.8% of Class A shares.

3.      On May 19, 2025, the Company announced its Board of Directors had "appointed a special committee comprised solely of independent directors and initiated a review of strategic

1

alternatives in order to explore ways to maximize shareholder value" including "a sale of the Company, a sale of assets, and a refinancing of existing indebtedness, among others."[1]

4.      On October 20, 2025, before the market opened, the Company announced the outcome of the special committee review. The special committee, in conjunction with its legal and financial advisors, "***unanimously determined***" that "***continuing to execute on the Company's strategic plan as an independent, public company is in the best interests of the Company and its stockholders*** at this time." However, the Company also disclosed that the entire Board of Directors, except for Nieri, was prepared to resign unless "the Company's existing management team was fully empowered to execute on the Company's strategic plan" and "Mr. Nieri stepped down from his position as Executive Chairman of the Company and agreed to forego any remaining cash compensation to which he would be entitled under his existing employment agreement, in furtherance of Company cost-saving initiatives." The Company reported that Nieri did not agree, and thus, six of the Company's seven board members resigned and only Nieri remained on the Board.

5.      On this news, United Homes' stock price fell $2.23 per share, or 52.46%, to close at $2.03 per share on October 20, 2025, on unusually heavy trading volume.

6.      On November 6, 2025, before the market opened, United Homes issued a press release announcing its financial results for the three and nine months ended September 30, 2025. The press release revealed that, following the Company's announcement of the special committee's findings and the majority of the Board's resignations, "the Company has been engaged in discussions with various key counterparties, including its lenders, land banking partners, and

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

insurers, regarding, among other things, the pressing need to identify replacement directors, maintaining compliance with loan covenants, and planning for the ongoing operations of the Company." The press release further revealed the Company had only closed 262 homes, a decrease of 29% year over year, resulting in $90.8 million in revenue, a decrease of 23% year over year.

7.      On this news, United Homes' stock price fell $0.11 per share, or 7.6%, to close at $1.34 per share on November 6, 2025, on unusually heavy trading volume.

8.      On February 23, 2026, before the market opened, United Homes announced that it had agreed to become a wholly owned subsidiary of Stanley Martin Homes, LLC in an all-cash transaction that represents an enterprise value of approximately $221 million, cashing out all stockholders for consideration of $1.18 per share. On the last trading day preceding the announcement, United Homes' stock closed at a price of $2.38. The deal price thus represents an over 50% discount on the preceding trading price. The transaction is expected to close in the second quarter of 2026, subject to customary closing conditions.

9.      On this news, United Homes' stock price fell $1.23 per share, or 51.68%, to close at $1.15 per share on February 23, 2026, on unusually heavy trading volume.

10.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company's controlling shareholder, Nieri, intended to force a sale of the Company; (2) that Nieri was taking actions to devalue the Company and its financial condition; (3) that Nieri leveraged his controlling interest to effectuate that sale, including by effectively forcing the dissident directors to resign; and (4) that, as a result of the foregoing, Nieri was not acting in the best interests of the Company and public investors.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.     Plaintiff Ramesh Kadiyam, as set forth in the accompanying certification, incorporated by reference herein, purchased United Homes securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17. Defendant United Homes is incorporated under the laws of Delaware with its principal executive offices located in Chapin, South Carolina. United Homes' common shares trade on the NASDAQ exchange under the symbol "UHG."

18. Defendant Michael Nieri ("Nieri") is the Company's founder. He was the Company's Chief Executive Officer ("CEO") from 2004 until October 1, 2024, and has been the Company's Executive Chairman since October 1, 2024.

19. Defendant John G. Micenko, Jr. ("Micenko") has been the Company's CEO since May 19, 2025.

20. Defendant Keith Feldman ("Feldman") was the Company's Chief Financial Officer ("CFO") at all relevant times.

21. Defendants Nieri, Micenko and Feldman (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

22.    United Homes is a residential home building company. The Company was founded by Nieri, who held the position of CEO until October 2024 and has been Executive Chairman since that time. As of April 25, 2025, Nieri and his family members held 68.8% of Class A shares and 100% of Class B shares.

### Materially False and Misleading

### Statements Issued During the Class Period

23.    The Class Period begins on May 19, 2025. On that day, the Company issued a press release announcing "that its Board of Directors has appointed *a special committee* [(the "Special Committee")] *comprised solely of independent directors and initiated a review of strategic alternatives in order to explore ways to maximize shareholder value*. The review will include a range of potential strategic alternatives, including a sale of the Company, a sale of assets, and a refinancing of existing indebtedness, among others." Specifically, the press release stated as follows, in relevant part:

### United Homes Group Announces Leadership Changes and

### Review of Strategic Alternatives

COLUMBIA, SC – May 19, 2025 – United Homes Group, Inc. (the "Company") (NASDAQ: UHG), today announced the appointment of John G. (Jack) Micenko, Jr., as Chief Executive Officer of the Company and Jeremy Pyle as co-Chief Operating Officer of the Company, and simultaneously therewith announced that its Board of Directors has appointed a special committee comprised solely of independent directors and *initiated a review of strategic alternatives in order to explore ways to maximize shareholder value. The review will include a range of potential strategic alternatives, including a sale of the Company, a sale of assets, and a refinancing of existing indebtedness, among others.* Mr. Micenko succeeds James M. (Jamie) Pirrello, who previously served as the Company's Interim Chief Executive Officer, and will continue to serve as a member of the Company's board of directors.

6

\*                                    \*                                    \*

Mr. Nieri continued, "*We are committed to maximizing value for all of our shareholders.* We believe that now is the appropriate time to evaluate a range of potential strategic alternatives, and we are confident in Jack's ability to lead UHG as we explore these alternatives."

24.     On August 7, 2025, the Company announced its financial results for the period ended June 30, 2025 in a press release. The press release reported the Company closed 303 homes, a decrease of 10% year over year, resulting in $105.5 million in revenue, a decrease of 4% year over year. The press release further provided a statement on the Company's purported financial condition and its ability and efforts to execute on its stated business strategy, including that the Company was allegedly conducting the strategic review to "*maximize shareholder value.*" Specifically, the press release stated as follows, in relevant part:

> *For the second quarter 2025, net loss was $6.3 million, or $0.11 per diluted share, which included a loss from the change in fair value of derivative liabilities of $6.2 million, with that change predominantly due to changes in fair value on potential earn-out consideration* due to fluctuation in the stock price during the measurement period, representing a non-cash item. The earnout consideration would be paid in common shares upon reaching certain stock price hurdles. The Company is required to record the fair value of this earnout as derivative liabilities on the Condensed Consolidated Balance Sheets and to record changes in fair value of derivative liabilities on the Condensed Consolidated Statements of Operations, in each case until UHG shares reach certain predetermined values or expiration of the five year earnout period. *Net income for the second quarter 2024 was $28.6 million, or $0.50 per diluted share, which included income from the change in fair value of derivative liabilities of $32.1 million.* Total Stockholders' equity for the second quarter 2025 was $82.2 million. Adjusted book value, which excludes the derivative liability and goodwill, was $96.9 million.
>
> "United Homes Group made progress on a number of fronts in the second quarter of 2025," said Jack Micenko, Chief Executive Officer and President of United Homes Group. "We continued to reap the benefits of the refreshed product initiative we implemented last year. We also made further strides in our efforts to improve our direct cost efficiency through the systematic rebidding of the materials and labor that go into our homes. We expect these initiatives, as well as several new communities set to be opened, to have a more significant impact on our results as we head into the second half of the year."

7

***Revenue, net of sales discounts, for the second quarter 2025 was $105.5 million, compared to $109.4 million in the second quarter 2024.*** Home closings during the second quarter 2025 were 303 compared to 337 in the second quarter 2024. Net new home orders during the second quarter 2025 were 304 compared to 323 in the second quarter 2024. ASP of 302 production-built homes (which excludes one percentage of completion home) closed during the second quarter 2025 was approximately $349,000, compared to approximately $341,000 during the second quarter 2024 for 299 production-built homes (which excludes two percentage of completion homes and 36 build to rent homes), representing a 2.5% increase.

*           *           *

**Recent Developments**

On May 19, 2025, the Company announced that its Board of Directors initiated a process to explore strategic alternatives, including a sale of the Company, a sale of assets, and a refinancing of existing indebtedness, among others, ***to maximize shareholder value.*** This process remains ongoing.

25.     On August 8, 2025, the Company submitted its quarterly report for the period ended June 30, 2025 on a Form 10-Q filed with the SEC (the "2Q25 10-Q"). The 2Q25 10-Q affirmed the previously reported financial results and further reported the Company was allegedly conducting the strategic review to "***maximize shareholder value,***" as follows in relevant part:

UHG intends to grow organically, both arising out of its historical operations which may include entry into new markets and growth in community count, and through expansion of its mortgage joint venture Homeowners Mortgage, LLC (the "Joint Venture"). UHG expects that continued operation of the Joint Venture will add to UHG's revenue and EBITDA growth, improve buyer traffic conversion, and reduce backlog cancellation rates. In the second quarter of 2025, ***UHG announced that it had initiated a review of strategic alternatives in order to explore ways to maximize shareholder value.*** There is not a set deadline or definitive timetable for the completion of the strategic alternatives review process, and there can be no assurance that this process will result in any transaction or particular outcome.

26.     The 2Q25 10-Q further alleged that the Company maintained effective internal disclosure controls and procedures, as follows in relevant part:

***Evaluation of Disclosure Controls and Procedures***

UHG's management, including the Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as of June 30, 2025. ***Based on this evaluation, management has***

8

***concluded that the Company's disclosure controls and procedures are effective*** in ensuring that information required to be disclosed in reports filed or submitted under the Securities Exchange Act of 1934 are recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.

27.    The 2Q25 10-Q also purported to warn the Company's "***exploration and pursuit of strategic alternatives may not be successful.***" Specifically the 2Q25 10-Q stated as follows, in relevant part:

> ***The exploration and pursuit of strategic alternatives may not be successful.***
>
> On May 19, 2025, UHG announced that the Board of Directors initiated a process to explore strategic alternatives to maximize shareholder value. ***The Company's exploration of strategic alternatives, including a sale, merger, or similar transaction, may not result in the identification or consummation of any transaction.*** In addition, the process of exploring strategic alternatives may be disruptive to UHG's operations and employee base, and the Company may incur substantial expenses associated with identifying and evaluating potential strategic alternatives. ***Any potential transaction and the related valuation would be dependent upon a number of factors that may be beyond the Company's control, including, among other factors, market conditions and industry trends.*** Further, speculation regarding any developments related to the strategic alternatives process could cause UHG's stock price to fluctuate significantly.

28.    The above statements identified in ¶¶23-27 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: vSpecifically, Defendants failed to disclose to investors: (1) that the Company's controlling shareholder, Nieri, intended to force a sale of the Company; (2) that Nieri was taking actions to devalue the Company and its financial condition; (3) that Nieri leveraged his controlling interest to effectuate that sale, including by effectively forcing the dissident directors to resign; and (4) that, as a result of the foregoing, Nieri was not acting in the best interests of the Company and public investors.

29.    The truth partially emerged on October 20, 2025, before the market opened, when the Company filed a Form 8-K with the SEC announcing the outcome of the Special Committee review. The announcement revealed the Special Committee, in conjunction with its legal and

financial advisors, had "***unanimously determined***" that "***continuing to execute on the Company's strategic plan as an independent, public company is in the best interests of the Company and its stockholders*** at this time." However, the Company disclosed that its entire board, except for Nieri, had threatened to resign unless "the Company's existing management team was fully empowered to execute on the Company's strategic plan" and "Mr. Nieri stepped down from his position as Executive Chairman of the Company and agreed to forego any remaining cash compensation to which he would be entitled under his existing employment agreement, in furtherance of Company cost-saving initiatives." The Company reported Nieri did not agree, and thus, six of the Company's seven board members resigned and only Nieri remained on the board. Specifically, the announcement stated as follows, in relevant part:

> United Homes Group, Inc. (the "Company"), today announced that the special committee of independent directors (the "Special Committee") previously appointed by the Board of Directors (the "Board") in May has, in conjunction with its legal and financial advisors, concluded its review of strategic alternatives. After evaluating a full range of strategic alternatives, including a potential sale, merger or other transaction, the Special Committee has unanimously determined that, in light of current macroeconomic conditions, continuing to execute on the Company's strategic plan as an independent, public company is in the best interests of the Company and its stockholders at this time.
>
> ***In connection with the conclusion of the strategic review process, four members of the Board, Robert Dozier Jr., Jason Enoch, Alan Levine and James M. Pirrello, informed Michael Nieri, the controlling stockholder and Executive Chairman of the Company, that they were willing to remain on the Board so long as (i) the Company's existing management team was fully empowered to execute on the Company's strategic plan and (ii) Mr. Nieri stepped down from his position as Executive Chairman of the Company and agreed to forego any remaining compensation to which he would be entitled under his existing employment agreement, in furtherance of Company cost-saving initiatives. Mr. Nieri would not agree to the foregoing conditions.*** Accordingly, on October 19, 2025, certain members of the Board announced their intention to resign from the Board, effective no later than November 14, 2025, in the hope of facilitating an orderly transition by allowing the Company to timely file its upcoming quarterly report on Form 10-Q and enabling Mr. Nieri to identify new directors, as described further in Item 5.02 below.

30.     On this news, United Homes' stock price fell $2.23 per share, or 52.46%, to close at $2.03 per share on October 20, 2025, on unusually heavy trading volume.

31.     The truth continued to partially emerge on November 6, 2025, before the market opened, when United Homes issued a press release announcing its financial results for the three and nine months ended September 30, 2025. The press release revealed that, following the Company's announcement of the special committee's findings and the majority of the Board's resignations, "*the Company has been engaged in discussions with various key counterparties, including its lenders, land banking partners, and insurers, regarding, among other things, the pressing need to identify replacement directors, maintaining compliance with loan covenants, and planning for the ongoing operations of the Company.*" The press release further revealed the Company had only closed 262 homes, a decrease of 29% year over year, resulting in $90.8 million in revenue, *a decrease of 23% year over year*. The press release further provided a statement on the Company's purported financial condition and its ability and efforts to execute on its stated business strategy, as follows, in relevant part:

> "United Homes Group's third quarter results reflect the affordability challenges and overall market conditions impacting the broader homebuilding industry," said Jack Micenko, Chief Executive Officer and President of United Homes Group. "While demand was softer earlier in the quarter due to delays in new community openings, we saw sequential improvement as the quarter progressed. *As we recently announced, the special committee of our board, which was established to conduct a comprehensive review of strategic alternatives available to UHG, concluded its work. Following this announcement, the Company continues to focus on improving operations and executing on our key initiatives and strategies to improve profitability and better position the Company for future success*."

> *Revenue, net of sales discounts, for the third quarter 2025 was $90.8 million,* compared to $118.6 million in the third quarter 2024. *Home closings during the third quarter 2025 were 262 compared to 369 in the third quarter 2024.* Net new orders during the third quarter 2025 were 324 compared to 341 in the third quarter 2024. ASP of 262 production-built homes closed during the third quarter 2025 was approximately $346,000, compared to approximately $320,000 during the third quarter 2024 for 369 production-built homes, representing an increase of approximately 8.1%.

11

\*                         \*                         \*

**Recent Developments**

On October 20, 2025, the Company announced the conclusion of the previously-announced review of strategic alternatives. ***After evaluating a full range of strategic alternatives, including a potential sale, merger or other transaction, the special committee of independent directors that was constituted for this purpose unanimously determined that, in light of current macroeconomic conditions, continuing to execute on the Company's strategic plan as an independent, public company is in the best interests of the Company and its stockholders at this time.*** At the same time, one of the Company's directors submitted his resignation effective immediately, and five of the Company's other directors notified the Company of their intent to resign from the Board no later than November 14, 2025. The reasons for such resignations are set forth in greater detail in the Company's Form 8-K filed on October 20, 2025*. **Following this announcement, management of the Company has been engaged in discussions with various key counterparties, including its lenders, land banking partners, and insurers, regarding, among other things, the pressing need to identify replacement directors, maintaining compliance with loan covenants, and planning for the ongoing operations of the Company.*** The Executive Chairman, who is a continuing member of the Board, is working to identify replacement directors with the requisite qualifications in order to maintain compliance with the requirements under Nasdaq Listing Rule 5605. If the Company is unable to successfully navigate these challenges, management expects continued pressure from these and other key relationships, which could have an adverse effect on the Company's operations.

32.    On this news, United Homes' stock price fell $0.11 per share, or 7.6%, to close at $1.34 per share on November 6, 2025, on unusually heavy trading volume.

33.    On November 7, 2025, the Company submitted its quarterly report for the period ended September 30, 2025 on a Form 10-Q filed with the SEC (the "3Q25 10-Q"). The 3Q25 10-Q affirmed the previously reported financial results and further reported the Company was allegedly managing the fallout of the Company's mass Board resignation and strategic review, as follows in relevant part:

**Recent Developments**

On October 20, 2025, the Company announced the conclusion of the previously-announced review of strategic alternatives. ***After evaluating a full range of strategic alternatives, including a potential sale, merger or other transaction, the special committee of independent directors that was constituted for this purpose***

12

*unanimously determined that, in light of current macroeconomic conditions, continuing to execute on the Company's strategic plan as an independent, public company is in the best interests of the Company and its stockholders at this time. At the same time, one of the Company's directors submitted his resignation effective immediately, and five of the Company's other directors notified the Company of their intent to resign from the Board no later than November 14, 2025.* The reasons for such resignations are set forth in greater detail in the Company's Form 8-K filed on October 20, 2025. Subsequent to the filing of such Form 8-K, the Company has identified and is reviewing the independence of three director candidates identified by Michael Nieri, the Company's Executive Chairman and a continuing director. In light of the Company's status with respect to appointment of replacement directors, directors Robert Dozier Jr., Jason Enoch, and Alan Levine informed the Company of their willingness to remain on the Board and applicable committees beyond November 14, 2025, to ensure an orderly transition as director candidates are identified and recruited in order to maintain compliance with the requirements under Nasdaq Listing Rule 5605. Director Nikki Haley and director James M. Pirrello resigned from the Board effective as of November 7, 2025. *Following the October 20 announcement, management of the Company has been engaged in discussions with various key counterparties, including its lenders, land banking partners, and insurers, regarding, among other things, the pressing need to identify replacement directors, maintaining compliance with loan covenants, and planning for the ongoing operations of the Company.* If the Company is unable to successfully navigate these challenges, including identifying and seating additional directors, management expects continued pressure from these and other key relationships, which could have an adverse effect on the Company's operations.

In addition, on November 6, 2025, the Company entered into Retention Agreements (each, a "Retention Agreement") with John G. (Jack) Micenko, the Company's Chief Executive Officer and President, Keith Feldman, the Company's Chief Financial Officer, and Erin Reeves McGinnis, the Company's General Counsel and Corporate Secretary (each, a "Participant"). Pursuant to the terms of the Retention Agreements, each Participant shall be paid a cash retention amount equal to 100% of their respective 2025 base salaries (the "Retention Payment"). In the event a Participant's employment with the Company is terminated prior to March 31, 2026, such Participant will be required to repay to the Company a pro rata portion of the after-tax value of the Retention Payment, provided that such termination is by the Company for Cause or by the Participant other than for Good Reason (each term as defined in the respective employment agreements of the Participants).

34.    The 3Q25 10-Q further alleged that the Company maintained effective internal disclosure controls and procedures, as follows in relevant part:

**Evaluation of Disclosure Controls and Procedures**

13

UHG's management, including the Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as of September 30, 2025. Based on this evaluation, *management has concluded that the Company's disclosure controls and procedures are effective* in ensuring that information required to be disclosed in reports filed or submitted under the Securities Exchange Act of 1934 are recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.

35.     The 3Q25 10-Q also purported to warn of the impact of the Company's strategic review, including that "*[t]he recent announcement regarding the planned resignations of substantially all of the members of UHG's board of directors has caused significant operational difficulty.*" Specifically, the 3Q25 10-Q stated as follows, in relevant part:

*Following the announcements regarding conclusion of the review of strategic alternatives and resignations of members of UHG's board of directors, the trading price of UHG's common stock has been volatile and such volatility may continue, which may adversely affect UHG's business, and investors in UHG's Class A common stock may experience substantial losses.*

On May 19, 2025, UHG announced that the Board initiated a process to explore strategic alternatives to maximize shareholder value. On October 20, 2025, following the evaluation of a full range of strategic alternatives, UHG announced that *the special committee of independent directors constituted for such purpose had concluded its review and determined that, in light of current macroeconomic conditions, continuing to execute on UHG's strategic plan as an independent, public company is in the best interests of UHG and its stockholders at this time*. At the same time, UHG also announced that James P. Clements had resigned from the board and all committees thereof, effective immediately, and that Robert Dozier, Jason Enoch, Alan Levine, Nikki Haley, and James Pirrello notified UHG of their intent to resign from the Board and all committees thereof no later than November 14, 2025. Following these announcements, the trading price of UHG's Class A common stock has been and may continue to be volatile. UHG's operating results, from time to time, may be below the expectations of public market analysts and investors, which could have a material adverse effect on the market price of UHG's Class A common stock. When the market price of a stock has been volatile, holders of that stock will sometimes file securities class action litigation against the company that issued the stock. If any shareholders were to file a lawsuit, UHG could incur substantial costs defending the lawsuit, which could also divert the time and attention of management.

*If UHG is unable to timely identify and recruit additional board members, UHG's Class A Common Stock may be subject to delisting.*

14

Following UHG's October 20, 2025 announcement regarding the resignation or planned resignation of substantially all of the members of the board of directors, UHG's Executive Chairman and continuing member of the Board is working to identify replacement directors with the requisite qualifications in order to maintain compliance with the requirements under Nasdaq Listing Rule 5605 (the "Corporate Governance Requirements"). In light of UHG's status with respect to appointment of replacement directors, directors Robert Dozier Jr., Jason Enoch, and Alan Levine informed UHG of their willingness to remain on the Board and applicable committees beyond November 14, 2025, to ensure an orderly transition as director candidates are identified and recruited in order to maintain compliance with the Corporate Governance Requirements. There can be no assurance that UHG will be able to maintain compliance with Nasdaq's listing standards. If UHG is unable to maintain compliance with Nasdaq's listing standards, UHG's common stock may become subject to delisting. A delisting of UHG's Class A common stock from Nasdaq may materially impair stockholders' ability to buy and sell UHG's Class A common stock and may adversely affect both the market for and the liquidity of UHG's Class A common stock. If UHG's stock is delisted from Nasdaq, whether by choice or otherwise, such delisting could significantly impair UHG's ability to raise capital and negatively impact stockholder value.

***The recent announcement regarding the planned resignations of substantially all of the members of UHG's board of directors has caused significant operational difficulty, and UHG expects such operational difficulties to continue and potentially increase until a satisfactory replacement board is seated.***

Since UHG's announcement on October 20, 2025 regarding the resignation or planned resignation of substantially all of the members of the board of directors, UHG has faced significant operational difficulties. Numerous key counterparties, including UHG's auditors, lenders, land banking partners, and insurers have expressed concern regarding UHG's ongoing corporate governance. Management of UHG has been engaged in discussions with these and other counterparties regarding, among other things, the pressing need to identify replacement directors, maintaining compliance with loan covenants, and planning for UHG's ongoing operations. In light of UHG's status with respect to appointment of replacement directors, directors Robert Dozier Jr., Jason Enoch, and Alan Levine informed UHG of their willingness to remain on the Board and applicable committees beyond November 14, 2025, to ensure an orderly transition as director candidates are identified and recruited in order to maintain compliance with the requirements under Nasdaq Listing Rule 5605. Despite this, UHG cannot provide any assurance that any counterparties will continue to engage in business with UHG, nor can it provide any assurance regarding the amount of time that will be needed to seat replacement directors. If UHG does not have an adequate number of independent directors constituting its Audit Committee, UHG will be unable to obtain an audit opinion, which will adversely affect UHG's ability to meet its SEC reporting obligations and will cause UHG to be in default under its debt arrangements. If these existing and prospective key relationships are unwilling to continue to engage

15

with UHG pending the seating of replacement directors, UHG will face significant restrictions on its ability to operate.

36.    The above statements identified in ¶¶29, 31, 33-35 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company's controlling shareholder, Nieri, intended to force a sale of the Company; (2) that Nieri was taking actions to devalue the Company and its financial condition; (3) that Nieri leveraged his controlling interest to effectuate that sale, including by effectively forcing the dissident directors to resign; and (4) that, as a result of the foregoing, Nieri was not acting in the best interests of the Company and public investors.

### Disclosures at the End of the Class Period

37.    The truth fully emerged on February 23, 2026, before the market opened, when United Homes announced that it had agreed to become a wholly owned subsidiary of Stanley Martin Homes, LLC in an all-cash transaction that represents an enterprise value of approximately $221 million, cashing out all stockholders for consideration of $1.18 per share. On the last trading day preceding the announcement, United Homes' stock closed at a price of $2.38. The deal price thus represents an over 50% discount on the preceding trading price. The transaction is expected to close in the second quarter of 2026, subject to customary closing conditions. Specifically, on that date, the Company issued a press release which stated as follows, in relevant part:

> RESTON, Va. & COLUMBIA, S.C.--(BUSINESS WIRE)-- Stanley Martin Homes, LLC ("Stanley Martin") and United Homes Group, Inc. (NASDAQ: UHG) ("United Homes") today announced that they have entered into a definitive agreement under which Stanley Martin will acquire United Homes in an all-cash transaction that represents an enterprise value of approximately $221 million.

> Under the terms of the agreement, United Homes shareholders will receive $1.18 per share in cash. The transaction is expected to close in the second quarter of 2026, subject to customary closing conditions.

16

38.     On this news, United Homes' stock price fell $1.23 per share, or 51.68%, to close at $1.15 per share on February 23, 2026, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired United Homes securities between May 19, 2025 and February 22, 2026, inclusive , and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, United Homes' shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of United Homes shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by United Homes or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

17

43.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of United Homes; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

44.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

45.    The market for United Homes' securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, United Homes' securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired United Homes' securities relying upon the integrity of the market price of the Company's securities and market information relating to United Homes, and have been damaged thereby.

46.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of United Homes' securities, by publicly issuing false and/or misleading

18

statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about United Homes' business, operations, and prospects as alleged herein.

47. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about United Homes' financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

48. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

49. During the Class Period, Plaintiff and the Class purchased United Homes' securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

50.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding United Homes, their control over, and/or receipt and/or modification of United Homes' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning United Homes, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

51.    The market for United Homes' securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, United Homes' securities traded at artificially inflated prices during the Class Period.  On August 22, 2025, the Company's share price closed at a Class Period high of $4.49 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of United Homes' securities and market information relating to United Homes, and have been damaged thereby.

52.    During the Class Period, the artificial inflation of United Homes' shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the

20

Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about United Homes' business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of United Homes and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

53.    At all relevant times, the market for United Homes' securities was an efficient market for the following reasons, among others:

(a)    United Homes shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, United Homes filed periodic public reports with the SEC and/or the NASDAQ;

(c)    United Homes regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    United Homes was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for United Homes' securities promptly digested current information regarding United Homes from all publicly available sources and reflected such information in United Homes' share price. Under these circumstances, all purchasers of United Homes' securities during the Class Period suffered similar injury through their purchase of United Homes' securities at artificially inflated prices and a presumption of reliance applies.

55.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

56.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-

22

looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of United Homes who knew that the statement was false when made.

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

57.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase United Homes' securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

59.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for United Homes' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

23

60.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about United Homes' financial well-being and prospects, as specified herein.

61.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of United Homes' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about United Homes and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

62.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances,

operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

63.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing United Homes' financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of United Homes' securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired United Homes' securities during the Class Period at artificially high prices and were damaged thereby.

65.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that United Homes was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their United Homes securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

68.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

69.    Individual Defendants acted as controlling persons of United Homes within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which

26

Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.     As set forth above, United Homes and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  April 10, 2026                    **GLANCY PRONGAY WOLKE & ROTTER LLP**
By: *Rebecca Dawson*
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email:  rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
clinehan@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Counsel for Plaintiff Ramesh Kadiyam*

**SWORN CERTIFICATION OF PLAINTIFF**

**UNITED HOMES GROUP, INC. SECURITIES LITIGATION**

I, Ramesh Kadiyam, certify that:

1. I have reviewed the Complaint, adopt its allegations, and authorize the filing of the Complaint on my behalf.

2. I did not purchase the United Homes Group, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this federal securities laws.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in United Homes Group, Inc. securities during the Class Period set forth in the Complaint are as follows:

   (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class in any action under the federal securities laws (15 U.S. Code, Chapter 2B; and 15 U.S. Code, Chapter 2A, Subchapter I) during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

3/19/2026
_____
Date

*RAMESH BABU KADIYAM*
_____
Ramesh Kadiyam

**Ramesh Kadiyam's Transactions in United Homes Group, Inc.**
**(UHG)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 10/2/2025 | Bought | 1,000 | $4.1000 |