**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

RAMESH KADIYAM, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

UNITED HOMES GROUP, INC., MICHAEL NIERI, JOHN G. MICENKO, JR., and KEITH FELDMAN,

Defendants.

Case No. 1:26-cv-02989-LJL

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

I. NATURE OF THE ACTION AND OVERVIEW ........ 1

II. JURISDICTION AND VENUE ........ 6

III. PARTIES ........ 7

A. Plaintiffs ........ 7

B. Defendants ........ 7

C. Relevant Non-Parties ........ 9

IV. SUBSTANTIVE ALLEGATIONS ........ 10

A. Overview Of The Company ........ 10

B. The Company's Ability To Fund Its Operations Relied On Its Revolving Credit Facility ........ 11

1. The Syndicated Line ........ 11

2. The Term Loan ........ 13

C. Prior To The Start Of The Class Period, The Board Established A Special Committee To Conduct A Review Of Strategic Alternatives To "Maximize Shareholder Value" ........ 14

D. The Company Conducted A Broad Auction Process, But Publicly Announced A Review Of Strategic Alternatives To "Maximize Shareholder Value" ........ 15

1. After Evaluating The Company's Health And Financial Viability, The Special Committee Determined A Broad Auction Was In The Best Interests Of The Company And Its Stockholders ........ 15

2. The Auction's First Round Generated Very Limited Interest ........ 17

3. As The Company's Risk Of Default Loomed Large, The Special Committee Repeatedly Questioned The Viability Of UHG As A Standalone Company And Explored A Sale To Stanley Martin ........ 18

4. The Company Obtained Temporary Covenant Relief Premised On A Potential Sale, But Stanley Martin Dropped Its Bid Due To UHG's Deteriorating Financial And Operational Performance ........ 20

E. The Truth Was Partially Revealed: Several Directors Resigned Because The Controlling Stockholder Refused To Implement Necessary Cost-cutting Measures ........ 24

F. Stanley Martin Re-Engaged, Lowering Its Proposed Purchase Price Significantly And Extending Its Exclusivity Period........ 25

G. Negotiations With Stanley Martin Continued, Resulting In A Sale With An Exclusivity Period Spanning Nearly Five Months (October 2025 To February 2026)........ 26

H. The Truth Is Fully Revealed: The Company Is Sold Months After The Market Was Told Remaining An Independent Public Company Was In The Best Interests Of The Company And Its Stockholders ........ 28

V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD........ 29

A. First Quarter For 2025 ("1Q 2025") ........ 29

B. Second Quarter For 2025 ("2Q 2025")........ 31

C. Third Quarter For 2025 ("3Q 2025")........ 32

D. Defendants Violated Item 303 Of Regulation S-K ........ 35

VI. LOSS CAUSATION........ 35

VII. ADDITIONAL SCIENTER ALLEGATIONS........ 37

A. During The Class Period, Numerous Internal Discussions Show Defendants Had Contemporaneous Knowledge Of, Or Recklessly Disregarded, Information That Contradicted Defendants' Public Statements........ 38

B. Micenko And Feldman, As Signatories To The Credit Amendments, Were Aware Of The Circumstances That Necessitated Covenant Relief........ 39

C. Post Class Period Disclosure Of Contemporaneous Admissions Of Liability During The Class Period ........ 40

D. The Company's Corporate Scienter........ 41

VIII. CLASS ACTION ALLEGATIONS ........ 42

IX. UNDISCLOSED ADVERSE FACTS........ 43

X. APPLICABILITY OF PRESUMPTION OF RELIANCE........ 44

XI. NO SAFE HARBOR ........ 46

XII. CLAIMS FOR RELIEF .......... 47

XIII. PRAYER FOR RELIEF .......... 51

XIV. JURY TRIAL DEMANDED .......... 52

Court-appointed Lead Plaintiff Julie DiMare and additional plaintiff Ramesh Kadiyam (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by United Homes Group, Inc. ("United Homes," or "UHG," or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by the Company; and (c) review of other publicly available information concerning the Company.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired United Homes Class A Common Stock or Warrants (together, "Securities") between May 14, 2025 and February 22, 2026, inclusive (the "Class Period"). Plaintiffs pursue claims against Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. United Homes designed, built, and sold single-family homes in South Carolina, North Carolina, and Georgia. It became a public company in March 2023 through a business combination between Great Southern Homes, founded by defendant Michael Nieri ("Nieri") in 2004, and DiamondHead, a special purpose acquisition company. At all relevant times, defendant Nieri was a controlling stockholder of UHG and held, with certain affiliates, approximately 70% of the total voting power.

3. The Company's operating strategy required substantial cash outlays at the beginning of each project—lot purchases, permits, construction, and property taxes—long before any home sale closed and revenue was recognized. UHG funded those outlays from cash on hand,

cash flows generated by operations, and borrowings under a revolving credit facility with Wells Fargo and other lenders (the "Syndicated Line"). In addition to the Syndicated Line, the Company borrowed $70 million in December 2024 as a subordinated loan (the "Term Loan") from certain lenders.

4. Both the Syndicated Line and the Term Loan imposed financial covenants concerning UHG's tangible net worth, leverage, debt service coverage, minimum liquidity, and minimum unrestricted cash. If the Company failed to comply with these covenants, it would be in default, and its lenders could declare all outstanding amounts immediately due and payable and terminate their commitments.

5. On March 6, 2025, more than two months before the Class Period began, the Company's Board of Directors formed a special committee of two independent directors (the "Special Committee") authorized to explore strategic alternatives, including remaining a standalone public company, a sale of the Company's assets, or a merger. With the assistance of advisors, the Special Committee determined that "the Company may require covenant relief under its existing financing arrangements to avoid a default" and that "refinancing would likely increase the cost of debt going forward." Following that discussion, the Special Committee determined that a broad auction process was in the best interests of the Company and its stockholders, and directed its financial advisor, Vestra, to work with Company's management to prepare a confidential information memorandum for circulation to potential bidders.

6. The Class Period begins on May 14, 2025 when, despite internal acknowledgment of the potential need for covenant relief or refinancing on more expensive terms to avoid default and that it was in the Company's and its stockholders' best interests to commence a broad auction process, Defendants assured investors that the Company's "current cash holdings including cash

generated from continuing operations and cash available under the Syndicated Line will be sufficient to satisfy its short term and long term cash requirements for working capital to support its daily operations, meet current commitments under its contractual obligations, and support the potential acquisition of complementary business."

7. Then on May 19, 2025, the Company announced that a Special Committee was formed to review "a range of potential strategic alternatives, including a sale of the Company, a sale of assets, and a refinancing of existing indebtedness." This disclosure was made one day after an internal meeting during which the Board and members of the Company's management discussed that the Company faced pressure on its operating performance and profitability "in terms of its current bank group as well as future compliance with financial covenants, especially if operating performance deteriorated," and that "a potential sale of the Company may be an optimal path to maximize value for all stockholders."

8. From late May through June 2025, Vestra approached 38 potential buyers, 22 signed non-disclosure agreements and received the confidential memorandum. Of those, three submitted non-binding first round indications of interest. On July 2, 2025, Vestra reported the limited interest to the Special Committee and members of the Company's management, noting valuations received suggested bidders "were valuing the Company predominately at or near its book value." By the second round, only one bidder remained, Stanley Martin Holdings, LLC ("Stanley Martin"), and its August 4, 2025 proposal cut its price from $150 to $134 million and was expressly conditioned on confirmation that defendant Nieri, the Company's controlling stockholder, would transact at that price.

9. By late summer 2025, the Special Committee discussed concerns that UHG would face covenant compliance issues and default as soon as September 30, 2025. On the eve of this

deadline, UHG amended both credit facilities. Those amendments, signed by the CEO and CFO, "provided temporary covenant relief to avoid defaults under the Company's existing credit facilities," and were required "as a result of the Company's deteriorating financial performance." Additionally, the Special Committee had acknowledged internally that "existing lenders were more open to providing covenant relief because the Company was in the process of considering strategic alternatives, but if that did not result in a successful sale of the Company, it would be more challenging to obtain covenant relief in the future and the Company would be at serious risk of defaulting under its existing credit facilities." That is, a failed auction process would be detrimental to the Company's financial future.

10. Investors were told none of this. Rather than disclose UHG's precarious financial condition, Defendants reassured the market that UHG's cash, operating cash flow, and availability under its credit facilities "will be sufficient to satisfy its short term and long term cash requirements." Even when Defendants eventually reported the amendments to the credit facilities, they presented the amendments as innocuous, stating merely that certain financial covenants were "amended" and "modified" and no other significant or material changes were made.

11. After Stanley Martin withdrew its sole bid from the auction process, UHG was forced to publicly reveal the results of the strategic review. On October 20, 2025, before the market opened, UHG shocked the market by announcing that the Special Committee "unanimously determined" that "***in light of current macroeconomic conditions***, continuing to execute on the Company's strategic plan as ***an independent, public company is in the best interests of the Company and its stockholders***."[1] The Company also revealed that four directors announced their intention to resign because defendant Nieri refused to step down as Executive Chairman, forego

[1] Unless otherwise indicated, all emphasis in bold and italics hereinafter is added.

remaining compensation to which he would be entitled, and empower management to execute the Company's strategic plan and cost-cutting initiatives.

12. On this news, the Company's share price fell $2.23 per share, or 52.35%, to close at $2.03 per share on October 20, 2025, on unusually heavy trading volume.

13. The statements on October 20, 2025 were still materially misleading because they failed to disclose that remaining a standalone public company was ***the only option*** following a failed auction process, that continuing to execute on the Company strategic plan was in the best interests of the Company and its stockholder ***only if*** certain cost-cutting measures were implemented, which defendant Nieri had already rejected those cost-cutting measures.

14. Unbeknownst to investors and despite publicly claiming that remaining a standalone public company was in the best interests of the Company and its stockholders, Defendants continued to negotiate a potential sale with Stanley Martin.

15. On February 23, 2026, four months after telling investors that operating as an independent public company was in their best interests, the Company shocked investors by announcing it had entered into a merger agreement with Stanley Martin with UHG stockholders receiving $1.18 per share.

16. On this news, the Company's share price fell $1.23 per share, or 51.68%, to close at $1.15 per share on February 23, 2026, on unusually heavy trading volume.

17. To effectuate the transaction with Stanley Martin, UHG filed a Merger Statement, which disclosed the substance of the Special Committee meetings convened in the months leading

up to the transaction.[2] The transaction closed in May 2026, and UHG became a subsidiary of Stanley Martin (the "Merger").

18. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's Securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

22. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

[2] "Merger Statement" refers to the Form DEFM14C (Information Statement – Merger or Acquisition (definitive)) filed with the SEC on April 10, 2026.

## III. PARTIES

### A. Plaintiffs

23. Lead Plaintiff Julie DiMare, as set forth in the Certification previously filed (ECF No. 17-2), incorporated by reference herein, purchased Securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24. Additional plaintiff Ramesh Kadiyam, as set forth in the Certification previously filed (ECF No. 5), incorporated by reference herein, purchased shares of Class A Common Stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

25. Defendant United Homes is incorporated under the laws of Delaware with its principal executive offices located in Chapin, South Carolina. Until the Merger, the Company's Class A Common Stock traded on the Nasdaq exchange under the symbol "UHG" and the warrants traded on the Nasdaq exchange under the symbol "UHGWW."

26. Defendant Nieri served as the Company's Executive Chairman and a member of its Board of Directors from October 1, 2024 through at least the close of the Class Period on February 22, 2026, and served as a director of the Company continuously from March 2023 through at least the end of the Class Period. He had previously served as Chairman of the Board and Chief Executive Officer ("CEO") from the Company's March 2023 business combination with DiamondHead Holdings Corp. ("DiamondHead"), a special purpose acquisition company, until September 30, 2024. From June 2004 through March 2023, Nieri served as President and Chairman of Great Southern Homes, Inc. ("GSH"), a company he founded. In the March 2023 business combination, GSH became a wholly owned subsidiary of DiamondHead, and DiamondHead was

renamed United Homes Group, Inc. Nieri served as GSH's CEO from June 2004 until June 2013 and again from January 2022 through March 2023. Nieri received a B.S. in construction science and management from Clemson University.

27. At all times relevant, Nieri controlled a majority of the Company's combined voting power. The Company acknowledged in its public filings that it was a "controlled company" within the meaning of the Nasdaq listing rules. Nieri's control was also written into the Company's debt: under the Term Loan agreement, a "Change of Control", triggering a prepayment obligation, would occur if Nieri "cease[d] for any reason to be principally involved as a member of senior management in the day to day operation of the Borrower" without an acceptable replacement within 60 days, or if he ceased to beneficially own at least 30% of UHG's voting power or a majority of its Class B common stock.

28. Defendant John G. (Jack) Micenko ("Micenko") became Chief Executive Officer and on May 19, 2025 and was President of the Company since July 2023. Prior to joining the Company as President, Micenko was a Managing Director at BTIG LLC ("BTIG"), where he led the firm's Housing Ecosystem investment banking practice, identifying opportunities for corporate clients across all aspects of the residential housing industry. Before his tenure at BTIG, Micenko held similar roles at Susquehanna International Group, LLP, Lehman Brothers Holdings Inc. and Friedman Billings Ramsey Group.

29. Defendant Keith Feldman ("Feldman") served as the Company's Chief Financial Officer ("CFO") since the Company's March 2023 business combination with DiamondHead and continued in that role through at least the close of the Class Period on February 22, 2026. Feldman served as DiamondHead's CFO from October 2020 until the business combination, and as a DiamondHead director from its inception until August 2022. From October 2020 through March

2024, Feldman served as a director and chairman of the audit committee of Lordstown Motors Corp. (later known as Nu Ride Inc). Feldman was CFO and Treasurer of NorthStar Realty Europe Corp. (NYSE: NRE) from May 2017 through September 2019, and held managing director positions at Colony Capital, Inc. from January 2017 to October 2019, at NorthStar Asset Management Group Inc., a predecessor of Colony Capital, from July 2014 to January 2017, and at NorthStar Realty Finance from January 2014 to July 2014. In each of these roles his responsibilities included capital markets, corporate finance, and investor relations. Feldman received a B.S. in accounting from Binghamton University, is a CFA charterholder, and a certified public accountant.

30. Defendants Nieri, Micenko and Feldman (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. Individual Defendants are liable for the false statements pleaded herein.

**C. Relevant Non-Parties**

31. Robert Dozier Jr. ("Dozier") was an independent director on the Company's board of directors from March 2023 through at least the end of the Class Period on February 22, 2026, with an announced-then-withdrawn resignation in October-November 2025. Dozier served on the Company's Audit, Compensation, and Related Party Transactions Committees and as Chair of the

Nominating and Corporate Governance Committee. At all times relevant, Dozier served on the Special Committee.

32. Jason Enoch ("Enoch") was the lead independent director on the Company's board of directors from March 2023 through at least the end of the Class Period on February 22, 2026, with an announced-then-withdrawn resignation in October-November 2025. Enoch served on the Company's Compensation Committee and as Chair on the Company's Audit and Related Party Transactions Committees. At all times relevant, Enoch served on the Special Committee.

33. Paul, Weiss, Rifkind, Wharton and Garrison LLP ("Paul Weiss") was engaged by the Special Committee in March 2025 to act as its legal counsel.

34. Vestra Advisors LLC ("Vestra") was engaged by the Special Committee in March 2025 to act as its financial advisor.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Overview Of The Company

35. The Company was originally founded as GSH in 2004 and went public in March 2023 following a business combination between GSH and DiamondHead. United Homes designed, built, and sold primarily single-family residential homes and, to a lesser extent, attached single-family houses, including duplex houses and town houses in South Carolina, North Carolina, and Georgia. The Company targeted geographic markets with population and employment growth. It employed a land-light lot operating strategy, with a focus on the design, construction and sale of entry-level, first, second and third move-up single-family houses.

**B. The Company's Ability To Fund Its Operations Relied On Its Revolving Credit Facility**

36. The Company funded its operations from its cash holdings, cash flows generated by operating activities, and borrowings under the revolving credit facility with Wells Fargo and others ("Syndicated Line").

37. The following table lists UHG's available cash from December 2024 through December 2025:

**Cash Holdings**

| Amount Available | As Of |
|---|---|
| $22.6 million | 12/31/2024 |
| $25.0 million | 3/31/2025 |
| $36.5 million | 06/30/2025 |
| $25.6 million | 09/30/2025 |
| $24.4 million | 12/31/2025 |

38. According to the Company's SEC filings, advances from the Syndicated Line were "used build homes" and were "repaid incrementally upon individual homes sales." The Company's filings also note that UHG has significant cash outlays to recognize revenue:

> [UHG is] generally required to make significant cash outlays at the beginning of a project related to lot purchases, permitting, and construction of homes, as well as ongoing property taxes. These costs are capitalized within UHG's real estate inventory and are not recognized in its operating income until a home sale closes. As a result, UHG incurs significant cash outflows prior to the recognition of associated earnings.

**1. The Syndicated Line**

39. The Syndicated Line provided for an aggregate commitment of up to $220.0 million. The availability under the Syndicated Line, which impacts total liquidity, is based on the inventory value at the time of the draw request, reduced by outstanding letters of credit that are

not fully cash collateralized. The following table lists the Syndicated Line's amount outstanding, and amount available from December 2024 through December 2025:

| Amount Outstanding | Amount Available | As Of |
|---|---|---|
| $50.2 million | $96.4 million | 12/31/2024 |
| $53.2 million | $61.9 million | 3/31/2025 |
| $64.2 million | $58.7 million | 06/30/2025 |
| $79.7 million | $57.5 million | 09/30/2025 |
| $78.2 million | $56.4 million | 12/31/2025 |

40. UHG's Syndicated Line contained significant restrictions on its ability to incur additional debt. The Syndicated Line also imposed affirmative, negative, and financial covenants on the Company, including:

- A minimum tangible net worth ***starting at $70 million*** plus (i) 25% of any positive consolidated earnings reported in a fiscal quarter, (ii) the full amount of any new equity contributed by the Borrower (as defined in the Wells Fargo Facility), (iii) the full amount of any increase in tangible net worth produced when convertible debt was exchanged for equity, and (iv) the full purchase amount of any repurchase of UHG's equity interests.
- A leverage ratio not to exceed 2.25 to 1.00, subject to a limited exception permitting a ratio of up to 2.50 to 1.00 in no more than two quarterly measurement periods between August 2, 2024 and December 31, 2025.
- A debt service coverage ratio[3] of at least 1.50 to 1.00 from June 30, 2024 through June 30, 2025, and at least 2.00 to 1.00 in every period thereafter. A ratio as low as 1.35 to 1.00 was permitted in no more than two quarterly measurement periods between August 2, 2024 and June 30, 2025.
- Minimum liquidity amount of no less than $37.5 million from June 30, 2024 forward, with that amount increasing to the greater of $45 million or 1.50 times

[3] The measure of how many times UHG's earnings covered its interest expense.

UHG's trailing twelve-month interest incurred in any period in which the debt service coverage ratio fell below 1.50 to 1.00.

- Hold unrestricted cash of at least $15 million at all times.

41. If the Company failed to comply with the covenants, restrictions or limitations in its agreement with Wells Fargo, it would be in default and lenders had the option to declare outstanding amounts due and payable and terminate their commitments.

42. As of August 2, 2024, the Syndicated Line's maturity date was August 2, 2027, except with respect to two non-extending lenders with a maturity date of August 10, 2026, which represented $73.3 million of the committed amount.[4]

**2. The Term Loan**

43. On December 11, 2024, the Company, through its wholly-owned subsidiary, GSH, entered into a credit agreement with certain lenders for a Term Loan for $70 million (approximately $67.4 million net proceeds) and used the proceeds to redeem outstanding convertible notes.

44. The Term Loan contained certain financial condition covenants that bound the Company including:

- A minimum tangible net worth of $70 million.
- A consolidated total leverage ratio not to exceed 2.50 to 1.00 per quarter, subject to a limited exception permitting a ratio of up to 2.625 to 1.00 in no more than two instances through December 31, 2025.
- A debt service coverage ratio of at least 1.35 to 1.00 until June 30, 2025, and greater than 1.50 to 1.00 thereafter, subject to a limited exception permitting a

---

[4] The Term Loan's maturity date, the date on which the loan was due and payable with all accrued and unpaid interest included, was the earlier of December 11, 2030, the Syndicated Line's maturity date, or the date the Syndicated Line is accelerated.

ratio between 1.20 to 1.00 and 1.35 to 1.00 in no more than two instances until June 30, 2025.

- Minimum liquidity amount of no less than $20 million at all times.
- Minimum unrestricted cash of no less than $10 million at all times.

45. If the Company failed to comply with the covenants, restrictions or limitations in its Term Loan agreement, it would be in default and lenders had the option to declare outstanding amounts due and payable and terminate their commitments.

### C. Prior To The Start Of The Class Period, The Board Established A Special Committee To Conduct A Review Of Strategic Alternatives To "Maximize Shareholder Value"

46. On March 6, 2025, the Board established a special committee composed of two independent directors, Robert Dozier Jr. and Jason Enoch. The Board authorized the Special Committee to:

- explore and consider various strategic alternatives and possible transactions potentially available to the Company, which may have included remaining a standalone public company, the sale of all or substantially all of the Company's assets or the merger of the Company with or into another entity, or other similar transaction (each, a "Possible Strategic Transaction");
- discuss and negotiate the terms and conditions of any one or more Possible Strategic Transactions, including the negotiation as may occur between the Company and the Controlling Stockholder;
- take any and all action deemed necessary to review and evaluate, together with its advisors, any one or more Possible Strategic Transactions;
- report the Special Committee's deliberations and recommendations with respect to any such Possible Strategic Transaction to the Board with reasonable frequency;
- consult with the Company's management and advisors in connection with its exploration and consideration of any such Possible Strategic Transaction; and
- elect not to pursue any Possible Strategic Transaction.

47. According to the Merger Statement, between March 2025 and February 2026, the Special Committee "held informal meetings, and joined regular update meetings with the Company's management and the Special Committee's advisors to discuss selected aspects of the strategic review process requiring management input." Also during that time, the Special Committee worked with the Company's management to gather information, review internal and external data, evaluate detailed financial analyses and projections, actively solicit and discuss a possible strategic transaction with potential counterparties, and consider the possibility of remaining a standalone public company.

### D. The Company Conducted A Broad Auction Process, But Publicly Announced A Review Of Strategic Alternatives To "Maximize Shareholder Value"

#### 1. After Evaluating The Company's Health And Financial Viability, The Special Committee Determined A Broad Auction Was In The Best Interests Of The Company And Its Stockholders

48. On April 30, 2025, two weeks before UHG filed its 1Q25 10-Q, the Special Committee met with its advisors and members of the Company's management to discuss UHG's business plan and its performance relative to its peers, among other topics. According to the Merger Statement, notable challenges facing UHG at that time included, among others, its "subscale size in the public markets, with elevated public company costs and overhead relative to its size," it was "considered highly leveraged for the sector," and "may require covenant relief under its existing financing arrangements to avoid a default and refinancing would likely increase the cost of debt going forward."

49. Following that discussion, the Special Committee determined that it was in the best interests of the Company and its stockholders to commence a broad auction process, and directed Vestra to start working with the Company's management to prepare a confidential information memorandum that could be shared with potential bidders in connection with an auction process.

50. On May 6, 2025, eight days before UHG filed its 1Q25 10-Q, the Special Committee met with its advisors and members of the Company's management. As the Merger Statement later disclosed, discussion topics included "potential transaction structures, forms of consideration, market-check requirements, and the need to assess any transaction against the alternative scenario where the Company continues on as a standalone public company." The Special Committee then directed Vestra to brief the Board on the strategic review process generally and the potential advantages of a near-term sale process.

51. On May 8, 2025, six days before UHG filed its 1Q25 10-Q, the Special Committee, members of the Company's management, Nieri, and Vestra met and previewed discussion topics for the upcoming Board and Compensation Committee joint meeting (held on May 18, 2025), including potential advantages of a near-term sale process.

52. On May 18, 2025, the Company held a joint meeting of the Board and its Compensation Committee, attended by members of the Company's management, Paul Weiss, and Vestra. The Special Committee gave the Board a high-level update on the strategic review, and Vestra presented "potential advantages of a near-term sale process." Vestra, in part, told the Board the following:

- the Company "was subscale as a public company, which has placed meaningful pressure on operating performance and profitability"
- macroeconomic challenges, economic uncertainty, and an ongoing home affordability crisis "had placed near-term significant pressure on operating performance for the sector, with the Company and its peers trading down significantly in 2025"
- the Company "faced additional pressures in terms of its current bank group as well as future compliance with financial covenants, especially if operating performance deteriorated"

- "a potential sale of the Company may be an optimal path to maximize value for all stockholders."

53. Following the May 18 meeting, the Special Committee authorized (1) Vestra "to reach out to a broad universe of potential buyers to solicit non-binding indications of interest for the Company;" and (2) the Company to announce it was exploring strategic alternatives.

54. On May 19, 2025, the Company announced its Board of Directors had "appointed a special committee comprised solely of independent directors and initiated a review of strategic alternatives in order to explore ways to maximize shareholder value" including "a sale of the Company, a sale of assets, and a refinancing of existing indebtedness, among others."

**2. The Auction's First Round Generated Very Limited Interest**

55. According to the Merger Statement, from late May through June 2025, Vestra approached thirty-eight potential buyers of the Company. Of those, twenty-two executed non-disclosure agreements, received the confidential information memorandum about UHG, and were invited to submit preliminary, non-binding first round indications of interest by June 20, 2025. Eighteen of the twenty-two declined to participate or bid.

56. Of the four potential buyers that expressed some interest, three submitted written first round indications of interest: (i) Stanley Martin Holdings, LLC ("Stanley Martin") at $150 million, all cash, no financing contingency, subject to diligence; (ii) a strategic acquirer identified in the Merger Statement as "Party A," at $100 to $120 million, all cash, no financing contingency, subject to diligence; and (iii) a strategic acquirer identified in the Merger Statement as "Party C," at $250 million, paid in cash and Party C stock, no financing contingency, subject to diligence.[5]

[5] A fourth potential buyer, identified as "Party B," indicated that it could be interested in a transaction and requested additional diligence materials, but would not submit an indication of interest "given the uncertainty around value expectations with the Controlling Stockholder," according to the Merger Statement.

57. According to the Merger Statement, on July 2, 2025, Vestra reported to the Special Committee, members of the Company's management, and Paul Weiss that there was limited interest in UHG, "none of the potential buyers would have submitted a first round of indication of interest without significant encouragement from Vestra," and the valuations received suggested potential buyers "were valuing the Company predominately at or near its book value."

**3. As The Company's Risk Of Default Loomed Large, The Special Committee Repeatedly Questioned The Viability Of UHG As A Standalone Company And Explored A Sale To Stanley Martin**

58. On August 4, 2025, Stanley Martin submitted a second round indication of interest at $134 million, all-cash, no financing contingency, subject to additional diligence. According to the Merger Statement, Stanley Martin's $16 million price reduction was based on, among other things, "the Company's declining operational performance, anticipated change of control costs, a review of the Company's real estate portfolio, discussions with the Company's management team and diligence conducted by Stanley Martin to date."[6]

59. According to the Merger Statement, Stanley Martin was the only participant in the auction's second round and its proposal was subject to approval by Stanley Martin's board and ultimate parent, Daiwa House Industry. Stanley Martin's second proposal also indicated it would "seek a confirmation from [Nieri] that he and his related investors would be willing to transact at the proposed price before Stanley Martin was willing to make a significant investment in diligence and negotiation of documents."

60. On August 5, 2025, the Special Committee met with its advisors and members of the Company's management to discuss the auction process, including the second Stanley Martin

[6] Parties A and C did not submit second round indications of interest and told Vestra neither was interested in moving forward at that time.

proposal. According to the Merger Statement, the Special Committee also discussed "***concerns regarding the viability of the Company as a standalone public company going forward.***" These concerns were particularly due to "emerging issues with the Company's lender base, including potential covenant compliance issues and potential defaults under the Company's existing credit facilities, which could occur as soon as September 30, 2025."

61. On August 6, 2025, following a regularly-scheduled Board meeting, the Board met with members of the Company's management in an executive session during which the Special Committee updated the Board on the status of the auction process. As the Merger Statement later disclosed, the Special Committee noted that Company "valuations were closer to the unaffected stock price prior to the announcement on May 19, 2025 that the Company was reviewing strategic alternatives," and "there were serious concerns about the Company's ability to maintain itself as a standalone public company going forward," and "***the Company was at serious risk of default under its existing credit facilities and would likely require covenant relief prior to September 30, 2025 or need to pursue refinancing, which would likely be at a higher cost of debt.***"

62. According to the Merger Statement, the Special Committee met with its advisors and members of the Company's management on August 20, 2025 to discuss the Company's debt obligations, liquidity, and ability to continue as a standalone company. Specifically, they discussed the following topics, among others:

- Stanley Martin's second proposal against three potential alternative scenarios: UHG continuing as a standalone public company (i) without significant changes or (ii) with certain cost-cutting measures, and Nieri potentially taking UHG private.
- UHG's likely need to amend its credit facilities before September 30, 2025 to provide covenant relief and avoid defaults or pursue refinancing, which would likely be more expensive debt;

- UHG's lender base may increase the Company's liquidity requirements if UHG were to continue as a standalone public company and any such increases would likely constrain UHG's ability to operate and sustain its contemplated level of growth and investment in new communities;
- UHG's overhead costs as a standalone public company were disproportionately high relative to the small scale and recent financial performance of the Company, and based on current projections, there was no clear path to grow out of that problem.
- Significant cost-cutting measures were needed if UHG remained a standalone public company including reducing employee headcount, cutting non-essential corporate overhead and repositioning the Company to focus on core markets by selling non-core assets.
- Cost-cutting measures may not be effective and there is a risk that their disruption to the business could outweigh any savings actually achieved and would leave little room for organic growth.

63. The Special Committee concluded that, based on the above analyses, it was in the best interests of the Company and its stockholders to continue to pursue a potential transaction, rather than remain a standalone public company.

**4. The Company Obtained Temporary Covenant Relief Premised On A Potential Sale, But Stanley Martin Dropped Its Bid Due To UHG's Deteriorating Financial And Operational Performance**

64. On September 5, 2025, Stanley Martin submitted its third proposal which maintained a proposed purchase price of $134 million, with no financing contingency, subject to additional diligence. According to the Merger Statement, Stanley Martin proposed additional terms including the sale be structured as a "sign and consent" transaction, with Nieri consenting to the transaction in writing within 24 hours of signing definitive agreements; grant Stanley Martin exclusivity and not solicit any alternative proposals until December 31, 2025; and UHG pay a $3 million termination fee.

65. On September 9, 2025, the Special Committee met with its advisors and members of the Company's management to discuss Stanley Martin's proposed purchase price of $134 million, which was, as the Merger Statement later disclosed, "lower than the Company's then-current market capitalization (which the Special Committee believed to be artificially inflated above fair market value due to the prior public announcement of the strategic review process)."

66. On September 15, 2025, the Special Committee met with its advisors and members of the Company's management to discuss the Company's viability to continue as a standalone public company and the status of covenant relief negotiations to avoid default under the credit facilities. According to the Merger Statement, during those discussions, members of the Company's management noted "they expected amendments to the Company's credit facilities to be finalized prior to the end of September 2025."

67. After meeting with Vestra and members of the Company management to discuss the Company's 3Q25 earnings on September 23, 2025, Stanley Martin emailed Vestra expressing concerns about UHG's financial and operational performance noting the 3Q25 results were "materially worse than the Initial Projections previously provided," according to the Merger Statement. Stanley Martin's email to Vestra also noted that though they were still interested in proceeding, there would need to be a new agreement on value.

68. According to the Merger Statement, the Special Committee met with its advisors and members of the Company's management on September 24, 2025. During that meeting, attended discussed issues with the potential sale to Stanley Martin and the "financial and operational performance of the Company" including:

- the Company was negotiating for covenant relief under its existing credit facilities,

- the Company's existing lenders were more open to providing covenant relief because the Company was in the process of considering strategic alternatives, but if that did not result in a successful sale of the Company it would be more challenging to obtain covenant relief in the future and the Company would be at serious risk of defaulting under its existing credit facilities,
- as a result of the above, existing lenders may seek to tighten liquidity covenants that may constrain the Company's ability to operate going forward,
- in light of the foregoing, the Company may not have the liquidity to sustain its contemplated level of growth and investment in new communities, and
- the Company may need to look for alternate financing sources, which could be difficult and expensive to obtain.

69. After the Special Committee's meeting on September 24, 2025, Stanley Martin proposed reducing its price from $134 million to $121 million, moving the target date for approval by its parent company from December 2025 to January 2026, and requested management provide revised projections for UHG.

70. On September 29, 2025, the Special Committee met with its advisors to discuss the status of the auction process. According to the Merger Statement, Vestra observed that "even with short-term relief, based on the revised projections, the Company would likely face covenant breaches under its existing credit facilities in 2026."

71. During that same meeting, the Special Committee acknowledged, "the Company's existing lenders were more open to providing covenant relief because the Company was in the process of considering strategic alternatives, but ***if that did not result in a successful sale of the Company, it would be more challenging to obtain covenant relief in the future and the Company would be at serious risk of defaulting under its existing credit facilities.***" The Special Committee then noted that if there was not a successful sale, "it would likely be difficult to refinance the

Company's debt in a manner that left the Company well situated to continue as a standalone public company going forward."

72. That same day, the Company entered its fourth amendment to its credit agreement for the Syndicated Line and its first amendment to its credit agreement with Kennedy Lewis, the administrator of the Term Loan, which, as the Merger Statement later disclosed, "provided temporary covenant relief to avoid defaults" under these credit facilities. The Syndicated Line's amendment was signed by both Micenko and Feldman, and the Term Loan's amendment was signed by Feldman on or around September 29, 2025.

73. According to the Merger Statement, on October 6, 2025, Stanley Martin withdrew from the potential sale transaction after reviewing "the additional materials the Company provided and the deterioration of the homebuilding market and the Company's performance." Stanley Martin further explained that while still interested, it did not believe the parties could come to an agreement on the valuation of the Company.

74. On October 8 and 14, 2025, Stanley Martin reiterated that it remained open to the possibility of a transaction with the Company in the future, subject to improvement in the homebuilding market and the Company's performance.

75. As the Merger Statement later disclosed, following Stanley Martin's withdrawal, the Special Committee concluded that "[d]espite publicly announcing the Special Committee's review of strategic alternatives, and running a thorough process involving at least 38 potential buyers, as well as outreach to Nieri about his potential interest, there were ultimately no actionable indications of interest to acquire, merge with or otherwise engage in a transaction involving the Company or take it private."

### E. The Truth Was Partially Revealed: Several Directors Resigned Because The Controlling Stockholder Refused To Implement Necessary Cost-cutting Measures

76. According to the Merger Statement, on October 19, 2025, the Special Committee met with members of the Company's management and others to discuss the Special Committee's conclusion and that Nieri had refused to accept the proposed cost-cutting measures.

77. As a result, on October 20, 2025, in connection with announcing the results of the Company's strategic review process, the Company disclosed that four directors had announced their intention to resign from the Board because defendant Nieri would not agree to the following conditions: "(i) the Company's existing management team was fully empowered to execute on the Company's strategic plan and (ii) Mr. Nieri stepped down from his position as Executive Chairman of the Company and agreed to forego any remaining compensation to which he would be entitled under his existing employment agreement, in furtherance of Company cost-saving initiatives."

78. On this news, UHG's stock price fell $2.23 per share, or 52.35%, to close at $2.03 per share on October 20, 2025, on unusually heavy trading volume.

79. The Company also announced that the Special Committee had "unanimously determined" that in light of "***current macroeconomic conditions***," it was in the best interests of the Company and its stockholders to continue as an independent public company.

80. However unbeknownst to the market, between October 8, 2025 and October 19, 2025, the Special Committee had various conversations with members of the Company's management, two additional non-management directors, Alan Levine and James Pirrello, and its advisors to discuss next steps for the Company. According to the Merger Statement, it was determined that "in light of current macroeconomic conditions ***and the unsuccessful auction process***, remaining a standalone public company was the ***only*** alternative available to the Company." The Merger Statement continued, "and, in those circumstances, it was in the best

interests of the Company and its stockholders to continue to execute on the Company's strategic plan, subject to the implementation of certain cost-cutting measures required to sustain the Company as a standalone public company." The same cost-cutting measures, Nieri had already rejected.

**F. Stanley Martin Re-Engaged, Lowering Its Proposed Purchase Price Significantly And Extending Its Exclusivity Period**

81. On October 22, 2025, two days after announcing the review was complete, Vestra reported to the Special Committee that there was some interest, including from Party A, in potentially reconsidering a transaction with the Company.

82. The next day, October 23, 2025, Vestra reported to the Special Committee that it had received further interest from Stanley Martin; and after reaching out to Nieri's counsel to share Party A's interest and request for additional information, Paul Weiss received confirmation that Nieri was still willing to consider a sale of the Company to a third party.

83. Vestra, on or around October 29, 2025, asked Party A and Stanley Martin to submit indications of interest by early the following week; Stanley Martin, the next day, responded that it was prepared to submit but the price might be too low for consideration. Vestra assured Stanley Martin that its letter of intent would get "full consideration."

84. On October 30, 2025, ten days after the Company publicly announced it would continue as an independent public company, Stanley Martin submitted a revised letter of intent with a reduced price of $85 million from $121 million and an additional 15-day extension of the exclusivity period, given its parent's board meeting was scheduled for January 2026.

85. On November 7, 2025, the resignations of Ambassador Nikki R. Haley and James M. Pirrello took effect. Rather than resign as announced, directors Dozier, Enoch, and Levine remained on the Board beyond November 14, 2025. According to the Merger Statement, Dozier

and Enoch also continued to serve on the Special Committee to "facilitate discussions with Stanley Martin given its re-engagement in discussions about a potential transaction involving the Company, ***based on their continued belief that it was in the best interests of the Company and its stockholders to pursue such a transaction rather than remain a standalone public company.***"

### G. Negotiations With Stanley Martin Continued, Resulting In A Sale With An Exclusivity Period Spanning Nearly Five Months (October 2025 To February 2026)

86. On November 14, 2025, Stanley Martin further revised its letter of intent by increasing its proposed price to $94 million and adding another 15-day exclusivity extension through its parent's board meeting in February 2026.[7] That same day, the Special Committee evaluated Stanley Martin's proposal and after discussions with its advisors, determined it was in the best interests of the Company and its stockholders to accept the proposal.

87. On November 25-26, 2025, a potential strategic acquirer "Party F" proposed $30 million in cash for all outstanding Class A Common Stock and $36 million in non-voting preferred stock for all outstanding Class B Common Stock, with the assumption of UHG's existing debt, which the Special Committee determined was not a superior proposal to Stanley Martin's latest $94 million proposal.

88. On December 4, 2025, Nieri and affiliated entities (Land to Lots, LLC, PC Land Development Co., LLC, and Pennington Development, LLC) (collectively, the "PC Entities") made a proposal for five properties that "were included in the asset base underwritten by Stanley Martin in determining its valuation of the Company," according to the Merger Statement.[8] As to

---

[7] Subsequently, Stanley Martin extended the exclusivity period a number of times between December 30, 2025 and the signing of the merger agreement, according to the Merger Statement.

[8] These discussions had been ongoing from late 2024 through mid-2025 but stalled until early December 2025 when UHG's management re-engaged (the "PC Property Transactions").

four of them, Camellia Park, Palomino Oaks, Southbridge, and Winter Farms, the proposal called for UHG subsidiaries to accelerate or expand purchases of finished lots and raw land from the PC Entities. As to the fifth, Halton Oaks, the proposal asked UHG to direct a third party land bank acting on UHG's behalf, GSH Land Fund, LLC, to purchase common area acreage and road access from one of the PC Entities. The same proposal also stated that Nieri was willing to resign as Executive Chairman and forgo a portion of his severance but only "in connection with the closing of a potential transaction involving Stanley Martin."

89. On December 4, 2025, Party C, which submitted the $250 million first round indication of interest, informed Vestra that it was considering re-engaging. The next day, Vestra informed Party C that UHG "was not in a position to engage with Party C at that time."[9]

90. On January 30, 2026, the Special Committee, Levine (the only remaining additional non-management director), members of the Company's management, Paul Weiss, and Vestra met with Nieri, his legal counsel, and representatives of Nieri's affiliated entities. During the meeting, Nieri was asked if he would forgo his entitlement to certain monies to increase the per share price payable to all stockholders. According to the Merger Statement, Nieri agreed to waive his severance and change of control entitlements (including a $6 million cash severance payment) for a one-time payment of $675,000, on the condition that the aggregate merger consideration payable to all stockholders be increased by $5,325,000.

91. On February 11, 2026, Stanley Martin agreed to increase the aggregate merger consideration by $5,325,000, which was the net cash amount Nieri gave up from his severance payment, to a total of approximately $99,325,000.

---

[9] On December 17, 2025, a new potential acquirer, "Party G," inquired about executing a non-disclosure agreement to discuss a potential transaction, to which Vestra declined based on the Company's obligations under the Stanley Martin proposal that was in effect at that time.

92. On February 22, 2026, the Company held a joint meeting of the Board, the Special Committee, the Related Party Transactions Committee, and the Compensation Committee, at which members of the Company's management were also present. According to the Merger Statement, the Special Committee asked Nieri, again, if he would forgo his Earn Out Shares, to which he declined.

### H. The Truth Is Fully Revealed: The Company Is Sold Months After The Market Was Told Remaining An Independent Public Company Was In The Best Interests Of The Company And Its Stockholders

93. The Board unanimously approved the Merger on February 22, 2026, as well as the amendment to Nieri's employment agreement and waiver, and the PC Property Transactions with Nieri and his affiliated entities.

94. The following day, before the market opened, the Company shocked investors when it issued a press release announcing the agreement under which Stanley Martin would acquire UHG in an all-cash transaction "that represents an enterprise value of approximately $221 million." The Company also announced UHG shareholders would receive $1.18 per share in cash and expected the transaction with Stanley Martin to close in 2Q 2026, subject to customary closing conditions.

95. On this news, United Homes' stock price fell $1.23 per share, or 51.68%, to close at $1.15 per share on February 23, 2026, on unusually heavy trading volume.

96. The transaction closed in May 2026, and UHG became a wholly owned subsidiary of Stanley Martin.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. First Quarter For 2025 ("1Q 2025")

97. On May 14, 2025, Defendants filed the Company's quarterly report for first quarter 2025 signed by defendant Feldman (the "1Q 2025 10-Q"). Therein, the Company described its liquidity and capital resources, in relevant part:

> UHG funds its operations from its current cash holdings and cash flows generated by operating activities, as well as borrowings under the revolving credit facility ("Syndicated Line"), as further described below. As of March 31, 2025, UHG had approximately $25.0 million in cash and cash equivalents, an increase of $2.4 million, from $22.6 million as of December 31, 2024. As of March 31, 2025 and December 31, 2024, UHG had approximately $61.9 million and $96.4 million, respectively, in unused committed capacity, calculated in accordance with the Syndicated Line.
>
> ***UHG believes that its current cash holdings including cash generated from continuing operations and cash available under the Syndicated Line will be sufficient to satisfy its short term and long term cash requirements for working capital to support its daily operations, meet current commitments under its contractual obligations, and support the potential acquisition of complementary businesses.***
>
> Cash flows used in and generated by UHG's projects can differ materially in timing from its results of operations, as these depend upon the stage in the life cycle of each project. UHG generally relies upon its syndicated line of credit to fund building costs, and timing of draws is such that UHG may from time to time be in receipt of funds from the Syndicated Line in advance of such funds being utilized. UHG is generally required to make significant cash outlays at the beginning of a project related to lot purchases, permitting, and construction of homes, as well as ongoing property taxes.

98. The statements identified in ¶97 were materially false and misleading and omitted material facts necessary to prevent them from being misleading because, at the time these statements were made: (i) there were operational and financial challenges related to the Company's leverage relative to its peers, its potential need for "covenant relief . . . to avoid a default," and the prospect that refinancing "would likely increase the cost of debt going forward"; (ii) as a result, the Company's ability to satisfy its long term cash requirements depended on obtaining covenant

relief or refinancing its indebtedness on more expensive terms; and (iii) the Company was internally being prepared for a sale, not for the acquisition of complementary businesses.

99. On May 19, 2025, Defendants issued a press release publicly disclosing the formation of the Special Committee to conduct a review of strategic alternatives to maximize shareholder value. The press release, which was also filed with the SEC that same day as an exhibit to a Form 8-K signed by defendant Feldman, stated:

> **United Homes Group Announces Leadership Changes and Review of Strategic Alternatives**
>
> COLUMBIA, SC – May 19, 2025 – United Homes Group, Inc. (the "Company") (NASDAQ: UHG), today announced the appointment of John G. (Jack) Micenko, Jr., as Chief Executive Officer of the Company and Jeremy Pyle as co-Chief Operating Officer of the Company, and simultaneously therewith announced that ***its Board of Directors has appointed a special committee comprised solely of independent directors and initiated a review of strategic alternatives in order to explore ways to maximize shareholder value. The review will include a range of potential strategic alternatives, including a sale of the Company, a sale of assets, and a refinancing of existing indebtedness, among others.*** Mr. Micenko succeeds James M. (Jamie) Pirrello, who previously served as the Company's Interim Chief Executive Officer, and will continue to serve as a member of the Company's board of directors.
>
> * * *
>
> Mr. Nieri continued, "***We are committed to maximizing value for all of our shareholders. We believe that now is the appropriate time to evaluate a range of potential strategic alternatives***, and we are confident in Jack's ability to lead UHG as we explore these alternatives."

100. The statements identified in ¶99 were materially false and misleading and omitted material facts necessary to prevent them from being misleading because: (i) the Company already faced challenges with regards to its performance and profitability and covenant compliance "especially if operating performance deteriorated"; and (ii) as a result, the Company was pursuing a broad auction process to solicit non-binding indications of interest from a broad universe of potential buyers.

**B. Second Quarter For 2025 ("2Q 2025")**

101. On August 8, 2025, Defendants filed the Company's quarterly report for second quarter 2025 signed by defendant Feldman (the "2Q 2025 10-Q"). Therein, the Company described its liquidity and capital resources, in relevant part:

> UHG funds its operations from its current cash holdings and cash flows generated by operating activities, as well as borrowings under the revolving credit facility ("Syndicated Line"), as further described below. As of June 30, 2025, UHG had approximately $36.5 million in cash and cash equivalents, an increase of $13.9 million, from $22.6 million as of December 31, 2024. As of June 30, 2025 and December 31, 2024, UHG had approximately $58.7 million and $96.4 million, respectively, in unused committed capacity, calculated in accordance with the Syndicated Line.
>
> ***UHG believes that its current cash holdings including cash generated from continuing operations and cash available under the Syndicated Line will be sufficient to satisfy its short term and long term cash requirements for working capital to support its daily operations and meet current commitments under its contractual obligations.***
>
> Cash flows used in and generated by UHG's projects can differ materially in timing from its results of operations, as these depend upon the stage in the life cycle of each project. UHG generally relies upon its syndicated line of credit to fund building costs, and timing of draws is such that UHG may from time to time be in receipt of funds from the Syndicated Line in advance of such funds being utilized. UHG is generally required to make significant cash outlays at the beginning of a project related to lot purchases, permitting, and construction of homes, as well as ongoing property taxes. These costs are capitalized within UHG's real estate inventory and are not recognized in its operating income until a home sale closes. As a result, UHG incurs significant cash outflows prior to the recognition of associated earnings. In later stages of projects, cash inflows could exceed UHG's results of operations, as the cash outflows associated with land purchase and home construction and other expenses were previously incurred.

102. The statements identified in ¶101 were materially false and misleading and omitted material facts necessary to prevent them from being misleading because at the time the statements were made (i) the Company's viability as a standalone company was in serious jeopardy considering its covenant compliance issues and potential defaults under the Company's existing credit facilities and would likely require covenant relief as early as September 30, 2025; and (ii)

as a result, the Company's ability to satisfy its long term cash requirements and to meet its commitments under the Syndicated Line and the Term Loan depended on obtaining covenant relief from its lenders or refinance its indebtedness on more expensive terms.

**C. Third Quarter For 2025 ("3Q 2025")**

103. On October 20, 2025, Defendants issued a press release announcing the results of the Company's strategic review process. The press release, which was also filed with the SEC that same day on a Form 8-K signed by defendant Feldman, stated, in relevant part:

> United Homes Group, Inc. (the "Company"), today announced that the special committee of independent directors (the "Special Committee") previously appointed by the Board of Directors (the "Board") in May has, in conjunction with its legal and financial advisors, concluded its review of strategic alternatives. ***After evaluating a full range of strategic alternatives, including a potential sale, merger or other transaction, the Special Committee has unanimously determined that, in light of current macroeconomic conditions, continuing to execute on the Company's strategic plan as an independent, public company is in the best interests of the Company and its stockholders at this time***.
>
> In connection with the conclusion of the strategic review process, four members of the Board, Robert Dozier Jr., Jason Enoch, Alan Levine and James M. Pirrello, informed Michael Nieri, the controlling stockholder and Executive Chairman of the Company, that they were willing to remain on the Board so long as (i) the Company's existing management team was fully empowered to execute on the Company's strategic plan and (ii) Mr. Nieri stepped down from his position as Executive Chairman of the Company and agreed to forego any remaining compensation to which he would be entitled under his existing employment agreement, in furtherance of Company cost-saving initiatives. Mr. Nieri would not agree to the foregoing conditions. Accordingly, on October 19, 2025, certain members of the Board announced their intention to resign from the Board, effective no later than November 14, 2025, in the hope of facilitating an orderly transition by allowing the Company to timely file its upcoming quarterly report on Form 10-Q and enabling Mr. Nieri to identify new directors, as described further in Item 5.02 below.

104. The statements identified in ¶103 were materially false and misleading and omitted material facts necessary to prevent them from being misleading because: (i) a broad auction process failed to produce a viable bidder to buy UHG; (ii) as a result, continuing as an independent public company "was the only alternative available to the Company," not a course that was

selected; (iii) the Special Committee believed a potential sale, not remaining a standalone public company, was in the best interests of UHG and its stockholders; (iv) the Company's existing lenders were more open to providing covenant relief because the Company was in the process of considering strategic alternatives; and (v) following the failed broad auction, there was a risk that UHG would not be able to obtain adequate covenant relief, leaving the Company at serious risk of default.

105. On November 6, 2025, Defendants issued a press release announcing the Company's 3Q 2025 financial results. The press release, which was also filed with the SEC that same day as an exhibit to a Form 8-K signed by defendant Feldman, stated:

> **Recent Developments**
>
> On October 20, 2025, the Company announced the conclusion of the previously-announced review of strategic alternatives. ***After evaluating a full range of strategic alternatives, including a potential sale, merger or other transaction, the special committee of independent directors that was constituted for this purpose unanimously determined that, in light of current macroeconomic conditions, continuing to execute on the Company's strategic plan as an independent, public company is in the best interests of the Company and its stockholders at this time***. At the same time, one of the Company's directors submitted his resignation effective immediately, and five of the Company's other directors notified the Company of their intent to resign from the Board no later than November 14, 2025.

106. Also on November 6, 2025, the Company held a conference call in connection with its financial results for 3Q 2025 ("3Q 2025 Earnings Call"). Therein, defendant Micenko addressed the Company's previous announcement regarding the conclusion of the review of strategic alternatives, stating in relevant part:

> Earlier this year, our board formed a special committee of independent directors to review a whole range of strategical alternatives for our company. ***After a comprehensive process and in consultation with our legal and financial advisors, the special committee unanimously determined that continuing to execute as an independent public company is the best path forward given the current macroeconomic environment.***

> In connection with the conclusion of this review, several members of our board notified us their intention to resign effective November 14th. We are taking steps to identify and appoint new independent directors in a timely manner to maintain compliance with our NASDAQ listing requirements.

107. On November 7, 2025, Defendants filed the Company's quarterly report for third quarter 2025 signed by defendant Feldman (the "3Q 2025 10-Q"). Therein, the Company reiterated its previous announcement regarding the conclusion of the review of strategic alternatives:

> On October 20, 2025, the Company announced the conclusion of the previously-announced review of strategic alternatives. ***After evaluating a full range of strategic alternatives, including a potential sale, merger or other transaction, the special committee of independent directors that was constituted for this purpose unanimously determined that, in light of current macroeconomic conditions, continuing to execute on the Company's strategic plan as an independent, public company is in the best interests of the Company and its stockholders at this time.*** At the same time, one of the Company's directors submitted his resignation effective immediately, and five of the Company's other directors notified the Company of their intent to resign from the Board no later than November 14, 2025.

108. The statements identified in ¶¶105-07 were materially false and misleading and omitted material facts necessary to prevent them from being misleading because they failed to disclose that: (i) continuing as an independent public company "was the only alternative available to the Company," not a course that was selected; (ii) the Special Committee believed a potential sale, not remaining a standalone public company, was in the best interests of UHG and its stockholders; (iii) the Company's existing lenders were more open to providing covenant relief because the Company was in the process of considering strategic alternatives; (iii) following the failed broad auction, there was a risk that UHG would not be able to obtain adequate covenant relief, leaving the Company at serious risk of default; (iv) to avoid default, UHG resumed talks with potential acquirers.

### D. Defendants Violated Item 303 Of Regulation S-K

109. Regulation S-K, 17 C.F.R. 229.303 ("Item 303"), obligates registrants to make certain disclosures in their periodic reports to the SEC (including Forms 10-Q and Forms 10-K), including an obligation to:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

(iii) If the statement of comprehensive income presents material changes from period to period in net sales or revenue, if applicable, describe the extent to which such changes are attributable to changes in prices or to changes in the volume or amount of goods or services being sold or to the introduction of new products or services.

110. The Company's 2Q 2025 10-Q, filed with the SEC on August 8, 2025, was materially false and misleading because it failed to disclose that the Company likely needed covenant relief before September 30, 2025 to stave off potential default, as internal meetings convened in the lead up to the filing show.

## VI. LOSS CAUSATION

111. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

112. The truth regarding the Company's leverage, covenant compliance, and liquidity was partially revealed and the concealed risks materialized on or about October 20, 2025 and February 23, 2026.

113. On October 20, 2025, before the market opened, the Company revealed that as part of the conclusion to the strategic alternatives review, four directors announced their intention to resign because defendant Nieri would not agree to the following conditions: "(i) the Company's existing management team was fully empowered to execute on the Company's strategic plan and (ii) Mr. Nieri stepped down from his position as Executive Chairman of the Company and agreed to forego any remaining compensation to which he would be entitled under his existing employment agreement, in furtherance of Company cost-saving initiatives." On this news, the Company's stock price fell $2.23 per share, or 52.35%, to close at $2.03 per share on October 20, 2025, on unusually heavy trading volume. This stock price decline was caused by a partial revelation of the truth that the Company's ability to continue as a standalone public company was contingent on certain cost-cutting measures.

114. On February 23, 2026, before the market opened, the Company filed a Form 8-K with the SEC announcing it had entered into a definitive merger agreement where Stanley Martin would acquire UHG in an all-cash transaction that represents an enterprise value of approximately $221 million, cashing out all stockholders for consideration of $1.18 per share. Micenko stated that the transaction "delivers immediate and certain cash value to our shareholders" and "represents the best outcome for our shareholders," just four months after Defendants told investors that "continuing to execute on the Company's strategic plan as an independent, public company is in the best interests of the Company and its stockholders at this time." On this news, United Homes' stock price fell $1.23 per share, or 51.68%, to close at $1.15 per share on February

23, 2026, on unusually heavy trading volume. This stock price decline revealed the truth that contrary to representations on October 20, 2025, and November 6 and 7, 2025, it was ***not*** in the best interests of the Company and its stockholders to remain a standalone public company and the Company's viability and value was far less than the stock price reflected leading up to this disclosure.

115. During the Class Period, Plaintiffs and the Class purchased United Homes Securities at artificially inflated prices and were damaged thereby. The price of the Company's Securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

116. As alleged herein, Defendants acted with scienter because Defendants (i) knew the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; (ii) knew such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding United Homes, their control over, and/or receipt and/or modification of United Homes' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning UHG, participated in the fraudulent scheme alleged herein.

117. Individual Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period without the

knowledge and complicity or, at least, the reckless disregard of the personnel at the highest level of the Company, including Individual Defendants.

### A. During The Class Period, Numerous Internal Discussions Show Defendants Had Contemporaneous Knowledge Of, Or Recklessly Disregarded, Information That Contradicted Defendants' Public Statements

118. As the Merger Statement later disclosed, internal discussions that contemporaneously contradicted Defendants' public statements were not confined to the Special Committee and its advisors. Members of the Company's management attended the Special Committee and Board meetings held on April 30, May 6, May 8, May 18, July 2, August 5, August 6, August 20, September 15, September 24, and October 19, 2025, among others, during which the Company's leverage, covenant compliance, risk of default under its credit facilities, and the viability of its continued operation as a standalone public company were discussed.

119. In the days leading up to announcement of the Company's 2Q 2025 financial results, members of the Company's management attended meetings during which the Company's exposure to default was assessed. For example, at the August 5, 2025 meeting, the Special Committee "discussed concerns regarding the viability of the Company as a standalone public company going forward" and "considered emerging issues with the Company's lender base, including potential covenant compliance issues and potential defaults under the Company's existing credit facilities, which could occur as soon as September 30, 2025." The next day, on August 6, 2025, the Board "met with members of the Company's management in executive session," where the Special Committee raised "serious concerns about the Company's ability to maintain itself as a standalone public company going forward" and "the Company was at serious risk of default under its existing credit facilities and would likely require covenant relief prior to September 30, 2025 or need to pursue refinancing, which would likely be at a higher cost of debt." Two days later, the Company told the market that its cash, operating cash flow, and availability

under the Syndicated Line would "be sufficient to satisfy its short term and long term cash requirements for working capital to support its daily operations and meet current commitments under its contractual obligations."

120. The matters discussed at the internal meetings listed in ¶118, *supra*, (i) go to the heart of the Company's very existence, and (ii) were core responsibilities of the Company's principal executive and principal financial officers. Thus, the most plausible inference is that both Micenko and Feldman attended or at the very least were made aware of the discussions at those meetings.

121. Additionally, according to the Merger Statement, the Special Committee worked with the Company's management to, among other things, gather information, review internal and external data, evaluate detailed financial analyses and projections, solicit and discuss with potential counterparties a Possible Strategic Transaction, including, where appropriate, providing access to certain diligence materials and management presentations, and the consideration, evaluation and negotiation of a range of Possible Strategic Transactions, as well as the possible result of not pursuing a transaction and remaining a standalone public company.

### B. Micenko And Feldman, As Signatories To The Credit Amendments, Were Aware Of The Circumstances That Necessitated Covenant Relief

122. Not only did members of the Company's management receive information about the Company's covenant exposure, they negotiated the temporary relief. According to the Merger Statement, during the September 15, 2025 meeting, which was attended by members of the Company's management, attendees discussed "the viability of the Company continuing as a standalone public company going forward and the status of negotiations for covenant relief to avoid default under the Company's existing credit facilities." The Merger Statement also stated that during those discussions, "members of the Company's management noted that they expected

amendments to the Company's credit facilities to be finalized prior to the end of September 2025." Another meeting with members of the Company's management that took place nine days later, also discussed the covenant relief negotiations including UHG's lenders being more open to covenant relief because UHG was considering strategic alternatives but "if that did not result in a successful sale" obtaining future covenant relief would be more challenging leaving the Company "at serious risk of defaulting under its existing credit facilities." During that same meeting, attendees also discussed the potential need to look for alternative financing sources but acknowledged that "could be difficult and expensive to obtain." Five days later, the Company executed the amendments that "provided temporary covenant relief to avoid defaults under the Company's existing credit facilities."

123. Nearly six weeks later, the Company filed the amended credit agreements as exhibits to the Company's 3Q 2025 10-Q. The Syndicated Line's amendment was signed by both Micenko and Feldman, and the Term Loan's amendment was signed by Feldman on or around September 29, 2025. Given that at the time of execution the total debt under the credit facilities was approximately $147.1 million, reasonable people managing their own affairs would have inquired as to the reasons for obtaining these amendments especially because the amount of debt was approximately 61.2% of the Company's total liabilities as of September 30, 2025.

124. In light of the foregoing, the most plausible inference is that Micenko and Feldman were involved in the negotiations of the amendments and would have been privy to the reasons that necessitated them.

**C. Post Class Period Disclosure Of Contemporaneous Admissions Of Liability During The Class Period**

125. According to the Merger Statement, the Special Committee met with members of the Company's management on at least two occasions during the Class Period to discuss purchase

proposals submitted by Stanley Martin and during which the fact that the Company's trading price was likely inflated due to the announcement of strategic alternatives on May 19, 2025 was discussed in the context of Stanley Martin's continued price reductions. For example, during the August 5, 2025 meeting attendees discussed Stanley Martin's second proposal, which reduced its proposed purchase price to a point that would result in a per share price that was beneath the Company's then-current trading price. It was in this context that attendees also discussed, "the fact that the Company's current trading price was likely inflated due to the announcement of strategic alternatives on May 19, and did not reflect the intrinsic value of the Company at this point in time." And again, during the September 9, 2025 meeting to discuss Stanley Martin's third proposal "which was lower than the Company's then-current market capitalization (which the Special Committee believed to be artificially inflated above fair market value due to the prior public announcement of the strategic review process)."

**D. The Company's Corporate Scienter**

126. The Company is liable for the acts of Individual Defendants and its other employees and agents under the doctrine of respondeat superior and common law principles of agency, including, for example, statements made in SEC filings signed by Feldman, because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

127. The scienter of Individual Defendants and other employees and agents of the Company—including, but not limited to, members of the Company's management that attended the various meetings described herein—is similarly imputed to the Company under the corporate scienter doctrine, respondeat superior, and agency principles.

## VIII. CLASS ACTION ALLEGATIONS

128. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired UHG Securities between May 14, 2025 and February 22, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

129. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, UHG's shares actively traded on the Nasdaq exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are at least hundreds or thousands of members in the proposed Class. Millions of UHG shares were traded publicly during the Class Period on the Nasdaq. Record owners and other members of the Class may be identified from records maintained by UHG or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

130. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

131. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

132. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of UHG; and

c) to what extent the members of the Class have sustained damages and the proper measure of damages.

133. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. UNDISCLOSED ADVERSE FACTS

134. The market for United Homes' securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, United Homes' securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired United Homes' securities relying upon the integrity of the market price of the Company's securities and market information relating to United Homes, and have been damaged thereby.

135. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of United Homes' securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or

misrepresented the truth about United Homes' business, operations, and prospects as alleged herein.

136. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about United Homes' financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE

137. The market for UHG's Class A Common Stock and Warrants was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, UHG's Class A Common Stock and Warrants traded at artificially inflated prices during the Class Period. On August 22, 2025, the Company's Class A Common Stock share price closed at a Class Period high of $4.49 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's Class A Common Stock and Warrants relying upon the integrity of the market price of UHG's securities and market information relating to UHG, and have been damaged thereby.

138. During the Class Period, the artificial inflation of United Homes' shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the

damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about United Homes' business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of United Homes and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

139. At all relevant times, the market for United Homes' securities was an efficient market for the following reasons, among others:

a) United Homes shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) As a regulated issuer, United Homes filed periodic public reports with the SEC and/or the NASDAQ;

c) United Homes regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d) United Homes was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were

distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

140. As a result of the foregoing, the market for United Homes' securities promptly digested current information regarding United Homes from all publicly available sources and reflected such information in United Homes' share price. Under these circumstances, all purchasers of United Homes' securities during the Class Period suffered similar injury through their purchase of United Homes' securities at artificially inflated prices and a presumption of reliance applies.

141. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. NO SAFE HARBOR

142. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of UHG who knew that the statement was false when made.

## XII. CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

143. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

144. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase UHG's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

145. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for UHG's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

146. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about UHG's financial well-being and prospects, as specified herein.

147. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of UHG's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about UHG and its business operations and financial viability in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

148. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or

reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

149. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing UHG's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

150. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of UHG's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known

to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired UHG's securities during the Class Period at artificially high prices and were damaged thereby.

151. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that UHG was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their UHG securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

152. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

153. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against Individual Defendants

154. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

155. Individual Defendants acted as controlling persons of UHG within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the

SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

156. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

157. As set forth above, UHG and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: September 11, 2026

**GLANCY PRONGAY WOLKE & ROTTER LLP**

By: *s/ Melissa Wright*

Melissa Wright
*mwright@glancylaw.com*
Robert V. Prongay
*rprongay@glancylaw.com*
Charles Linehan
*clinehan@glancylaw.com*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

Rebecca Dawson
*rdawson@glancylaw.com*
745 5th Avenue, 5th Floor
New York, New York 10151
Telephone: (212) 935-7400

*Counsel for Plaintiffs*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Additional Counsel*

**PROOF OF SERVICE**

I hereby certify that on this 11th day of September, 2026, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Melissa Wright*
Melissa Wright